[Tagged]



**ORDERED in the Southern District of Florida on December 28, 2012.**

**Erik P. Kimball, Judge
United States Bankruptcy Court**

---

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION**

| | |
|---|---|
| In re: | Case No. 11-26900-EPK |
| **DENISE ROBERTS-DUDE,** | Chapter 11 |
|     **Debtor.** | |

_____/

| | |
|---|---|
| **STEWART TITLE GUARANTY COMPANY,** | |
|     **Plaintiff,** | |
| v. | Adv. No. 11-02334-EPK |
| **DENISE ROBERTS-DUDE,** | |
|     **Defendant.** | |

_____/

## <u>MEMORANDUM OPINION</u>

THIS MATTER came before the Court for trial on July 9 and July 10, 2012 upon the

*Second Amended Complaint for: (1) Allowance of Claims, and (2) Determination of Non-*

*Dischargeability of Debt* [ECF No. 49] (the "Complaint") filed by Stewart Title Guaranty

Company (the "Plaintiff") against Denise Roberts-Dude (the "Defendant") and the *Defendant's Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint and Counterclaim* [ECF No. 50] (the "Counterclaim") filed by the Defendant against the Plaintiff.  This Memorandum Opinion presents the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

The Complaint presents five counts: Count I for establishment, liquidation, and allowance of a claim under § 502[1] based on fraud; Count II for establishment, liquidation, and allowance of a claim under § 502 based on concealment; Count III for establishment, liquidation, and allowance of a claim under § 502 based on breach of contract; Count IV for establishment, liquidation, and allowance of a claim under § 502 based on unjust enrichment; and Count V for exception from discharge under § 523(a)(2)(A). The Complaint includes a request for attorneys' fees, costs, interest, and exemplary (i.e., punitive) damages.  The Counterclaim presents two counts: Count I for breach of contract; and Count II for fraud.  The Counterclaim includes a request for attorneys' fees and costs.

The Court considered the testimony of witnesses and the documentary evidence admitted at trial, the *Joint Pretrial Stipulation* [ECF No. 96] filed by the parties, the subsequent *Joint Pretrial Stipulation* [ECF No. 101] filed by the parties, as supplemented by the *Agreed Order Granting Plaintiff's Motion to Add Stipulated Facts to Pretrial Stipulations* [ECF No. 135], and the post-trial briefs filed by the parties [ECF Nos. 186 and 189].

This case presents a vexing problem for the Court.  There is no doubt that the Defendant is liable to the Plaintiff.  She signed an affidavit stating that there were no liens on a parcel of real property other than those already identified by the Plaintiff, a title

---

[1] The symbols "§" and "§§" refer to sections of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

insurer. Yet she knew that there was a substantial deed of trust on the property that the Plaintiff failed to discover. The Plaintiff issued a title insurance policy that did not except the deed of trust from coverage and was later required to pay nearly $2 million to resolve the matter. The Defendant personally received more than $1.8 million in cash as a result of her deception. In spite of a landslide of evidence to the contrary, the Defendant continues to claim that she had no knowledge of any of the material facts and no intention to deceive the Plaintiff. The Defendant's protestations are completely incredible. The Defendant may be an unfortunate debtor before this Court, but she is certainly not honest.

However, the Plaintiff has the burden of proving every aspect of its case by a preponderance of the evidence. A central element in this adversary proceeding—the crux of this Court's decision that the Defendant's debt to the Plaintiff will not be excepted from discharge—is that the Plaintiff must show not only that it actually relied on the Defendant's deception but that its reliance was justified. The Plaintiff need not go so far as to prove that a reasonable person in the same circumstances would have relied on the Defendant's misrepresentation. The deed of trust in question lacked a property description but was nonetheless indexed in a manner such that a reasonable person surely would have found it. If reasonable reliance was the applicable standard, the Plaintiff would most certainly fail. There is no doubt that the Plaintiff actually relied on the Defendant's lie to its detriment, but actual reliance is just one component of the claim. The Plaintiff must go one step further. Taking into account the Plaintiff's own skill, knowledge, and experience, the Plaintiff must convince the Court that its reliance was justified. Yet the Plaintiff is a national insurer with extensive experience in review of title matters. The evidence shows that the Plaintiff always conducts title searches in such a manner that it should have found the deed of trust in question. In particular, the evidence supports the conclusion that the Plaintiff's agent actually conducted the search which would have disclosed a particular

deed that, by the Plaintiff's own admission, would have caused it to conduct an additional search and thereby locate the subject deed of trust. But somehow this did not happen. Is this simply the negligence of the Plaintiff in the face of the Defendant's intentional tort, and so should be discounted? The answer is that it is more than negligence. In light of the Plaintiff's relevant skill, knowledge, and experience, the level of title review that would have revealed the deed of trust was the slightest inspection, a cursory glance. It is not that the Plaintiff did not look. Here the Plaintiff looked but did not see. The Plaintiff cannot now complain that its injury was brought about by the Defendant's misrepresentation. And so the Plaintiff's reliance on the Defendant's misrepresentation was not justified and the resulting debt will be subject to discharge in this case.

For the reasons stated more fully below, the Plaintiff will have an allowed unsecured claim against the estate in the amount of $2,925,000.00, and such claim may be subject to discharge in this case.

## I.    FINDINGS OF FACT

The Defendant sometimes goes by the nickname "Dee". The Defendant is married to Harald Dude ("Mr. Dude"). Mr. Dude is not currently a debtor in a bankruptcy proceeding. The Defendant and Mr. Dude are residents of West Palm Beach, Florida.

At all relevant times, the Defendant was a general partner of Dee Investments Limited Partnership, a Nevada limited partnership ("Dee Investments"). At all relevant times, Dee Holdings, Inc., a Nevada corporation ("Dee Holdings"), was a general partner of Dee Investments. At all relevant times, the Defendant was the president, treasurer, secretary, and director of Dee Holdings.

The Plaintiff is a Texas corporation in the business of underwriting title insurance policies. At all relevant times, Stewart Title of Colorado, Inc. ("Stewart Colorado"), a

Colorado corporation, served as the Plaintiff's agent by performing title examinations, handling real estate closings, and issuing title insurance policies underwritten by the Plaintiff.

David William Lester ("Mr. Lester") is a resident of Bali, Indonesia.  At all relevant times, Mr. Lester was a real estate broker and real estate investor/developer in Aspen, Colorado.

As of March 27, 2000, Mr. Dude owned, in his own name, real property located at 600 N. Third Street, Aspen, Pitkin County, Colorado 81611 (the "Property").  On March 27, 2000, Mr. Dude conveyed the Property to Dee Investments via a general warranty deed, which was recorded the following day with the Pitkin County, Colorado Clerk and Recorder (the "Clerk").

In the spring of 2003, Mr. Dude personally applied to Wells Fargo Bank, N.A. ("Wells Fargo") for a $500,000.00 home equity line of credit, to be secured by the Property. Wells Fargo then sought to obtain a title insurance policy underwritten by the Plaintiff to protect Wells Fargo's proposed security interest in the Property.  Stewart Colorado, through its title examiner Charles Dorn ("Mr. Dorn"), performed an examination of title to the Property using the Clerk's database to search recorded liens and encumbrances on, and transfers of, the Property.  Mr. Dorn conducted three searches in the Clerk's database: (a) a search using the legal description of the Property; (b) a grantor search using the name of the record owner of the Property at the time, Dee Investments; and (c) a search using the name of the proposed security interest grantee, Wells Fargo.  Subsequently, on April 30, 2003, Stewart Colorado issued a commitment bearing file number 41035 to issue a $500,000.00 title insurance policy underwritten by the Plaintiff as to the Property for the benefit of Wells Fargo (the "Wells Fargo Title Commitment").  The Wells Fargo Title Commitment stated that a $200,000 deed of trust in favor of Furr and Cohen, P.A. (the

"Furr and Cohen Deed of Trust") would be excepted from coverage under the title policy to be issued. The Wells Fargo Title Commitment listed Dee Investments as the record owner of the Property.

On May 29, 2003, in return for another loan obtained by Mr. Dude, Mr. Dude executed a $1,900,000.00 Adjustable Rate Note (the "WAMU Note") in favor of Washington Mutual Bank ("WAMU"). On June 4, 2003 at 12:31 p.m., a quitclaim deed was recorded with the Clerk which conveyed the Property from Dee Investments back to Mr. Dude. On June 4, 2003 at 12:32 p.m., while title to the Property was lodged in Mr. Dude, a deed of trust in favor of WAMU in the principal amount of $1,900,000.00 (the "WAMU Deed of Trust") was recorded with the Clerk against the Property, thereby securing the WAMU Note. The WAMU Deed of Trust recorded on June 4, 2003 did not contain a legal description of the Property, but did contain the Property's street address. On June 9, 2003, a quitclaim deed was recorded with the Clerk which conveyed the Property from Mr. Dude yet again to Dee Investments.

On July 2, 2003, Mr. Dude executed the Indemnity and Affidavit as to Debts, Liens, and Possession (the "Dude Affidavit") in connection with the closing on the proposed Wells Fargo home equity line of credit and associated issuance of title insurance underwritten by the Plaintiff as to the Property. The Dude Affidavit bears file number 41035 and states, in pertinent part:

> Harald Dude . . . represents to the purchaser and/or Lender in this transaction that there are . . . [n]o loans, unpaid judgments, or liens (including Federal or State Liens or Judgment Liens) and no unpaid governmental or associations taxes, charges or assessments of any kind on [the Property] except the following:

In the space following this text Mr. Dude wrote in his own hand the word "NONE". On the next page of the Dude Affidavit, Mr. Dude signed under the following language:

If any Deed of Trust Recorded against my property secures an open line of credit or a revolving line of credit, I/we affirm that I/we have not drawn additional funds from the line of credit since the date of the title payoff statement from my/our lender to Stewart Title.  I/we further agree and affirm that I/we will not make any further draws on the line of credit after the date of this affidavit.  I/we further affirm that I/we have not taken out any loans against our property other than those shown on the above referenced title commitment number.

Indemnity:  I agree to pay on demand to the purchaser and or lender and/or title companies (including Stewart Title Guaranty Company) in this transaction, their successors and assigns, all amounts secured by any and all liens, claims or rights not shown above, together with all costs, loss and attorney's fees that said parties may incur in connection with such unmentioned liens, provided said liens, claims, or rights either currently apply to such property, or a part thereof, or are subsequently established against said property and are created by me, known by me, or have an inception or attachment date prior to the closing of this transaction and recording of the deed and mortgage.

I realize that the purchaser and/or Lender and Title Companies in this transaction are relying on the representations contained herein in purchasing same or lending money thereon and issuing title policies and would not purchase same or lend money or issue a title policy thereon unless said representations were made.   If Seller or Borrower is an entity, I have authority to sign on its behalf.

Also on July 2, 2003, Mr. Dude executed a $500,000.00 Home Equity Line of Credit Agreement (the "Wells Fargo Note") in favor of Wells Fargo.  On July 8, 2003 at 3:53 p.m., a quitclaim deed was recorded with the Clerk which again conveyed the Property from Dee Investments to Mr. Dude.  On July 8, 2003 at 3:56 p.m., while Mr. Dude had title to the Property, a deed of trust (the "Wells Fargo Deed of Trust") in favor of Wells Fargo in the principal amount of $500,000.00 was recorded with the Clerk against the Property, thereby securing the Wells Fargo Note.

Immediately prior to the recording of the Wells Fargo Deed of Trust, Stewart Colorado, through its title assistant Peter Stelljes ("Mr. Stelljes"), performed date down[2]

---

[2] A date down search covers what is known as the 'gap period', i.e., the period between the issuance of the title commitment and the time the instrument connected to the proposed title insurance policy is recorded.  If a previously unknown lien or encumbrance is discovered during the date down search,

searches for recorded liens and encumbrances on, and transfers of, the Property. Mr. Stelljes conducted three date down searches in the Clerk's database: (a) a search using the legal description of the Property; (b) a grantor search using the name of the record owner listed on the Title Commitment, Dee Investments; and (c) a search using the name of the proposed security interest grantee, Wells Fargo. The WAMU Deed of Trust had been recorded subsequent to Stewart Colorado's initial title examination. Because the WAMU Deed of Trust was recorded without a legal description of the Property, the search using the legal description of the Property did not disclose the WAMU Deed of Trust. Because Mr. Dude, not Dee Investments, was the grantor of the WAMU Deed of Trust, the search under the owner named on the title commitment, Dee Investments, did not disclose the WAMU Deed of Trust. However, a search in the Clerk's database on July 8, 2008 using the grantor name Dee Investments would have revealed the June 4, 2003 quitclaim deed conveying the Property from Dee Investments to Mr. Dude, and a search using the grantor name Harald Dude would have revealed the June 9, 2003 quitclaim deed from Mr. Dude to Dee Investments.[3] A search under the grantor name Harald Dude would also have revealed the WAMU Deed of Trust.[4]

On July 8, 2003 at 3:57 p.m., Stewart Colorado issued a $500,000.00 title insurance policy underwritten by the Plaintiff as to the Property for the benefit of Wells Fargo (the "Wells Fargo Policy"). The Furr and Cohen Deed of Trust was excepted from coverage under the Wells Fargo Policy; the WAMU Deed of Trust was not.

---

the instrument is not recorded, and the title insurance policy is not issued, without further review and/or modification.

[3] At trial, the Plaintiff's counsel conceded these points. ECF No. 184, Trial Trans.7/9/12, pp.22-24. It was Stewart Colorado's regular practice to search the name of any person or entity that was a prior grantee of the Property in the chain of title. Exhibit 201, District Court Trial Trans., 6/20/2011, pp.128 -129.

[4] At trial, the Plaintiff's counsel conceded this point. ECF No. 184, Trial Trans.7/9/12, pp.22-24; *see also* Exhibit No. 173 and Exhibit No. 212, Lyndee Dean Depo. 1/10/12, p.14, l.14 – p.17, l.20; p.20, l.15 – p.21, l.23.

The Wells Fargo Policy became a starter policy. If Stewart Colorado was called to examine the title of the Property again, Stewart Colorado's subsequent examinations would only go back to the date of the Wells Fargo Policy. Although not a universal practice, this approach is common in the title insurance industry.

On July 8, 2003 at 3:58 p.m., a quitclaim deed was recorded with the Clerk which conveyed the Property from Mr. Dude again to Dee Investments.

Beginning in 2005, the Defendant and Mr. Dude began planning with Mr. Lester to form a joint venture to remodel and sell the Property. During the initial discussions regarding this plan, Mr. Lester asked the Defendant and Mr. Dude about liens encumbering the Property. Mr. Lester was told by the Defendant and Mr. Dude, via individual telephone calls with each and conference telephone calls with both, that the Property was encumbered by three liens totaling approximately $2,500,000.00. Simple math shows that this sum included the Wells Fargo Deed of Trust, the Furr and Cohen Deed of Trust, and also the WAMU Deed of Trust. Even at this early date the Defendant knew that the Property was encumbered by the WAMU Deed of Trust.

Toward the end of 2005, Mr. Lester, the Defendant, and Mr. Dude considered an alternative plan to sell the Property during the peak Christmas holiday season in Aspen without first remodeling it. On October 6, 2005, after discussions among the Defendant, Mr. Dude, and Mr. Lester, Mr. Dude, on behalf of Dee Investments, signed an agreement with Mr. Lester granting Mr. Lester the exclusive right to list the Property, with a listing price of $4,595,000.00.

By the beginning of January of 2006, the alternative plan proved unsuccessful, and the Defendant, Mr. Dude, and Mr. Lester again began pursuing their original plan to remodel and sell the Property, with the approximately $2,500,000.00 of debt encumbering the Property to be satisfied when a newly-formed partnership would purchase the Property

using proceeds from a new loan.  In early January 2006, Mr. Lester had several telephone conversations with the Defendant, individually and together with Mr. Dude, regarding a deal structure.  On January 18, 2008, Mr. Lester sent two emails to confirm this deal structure to the Defendant's email address.[5]  The first email contained a draft operating agreement for a limited liability company.  The second email, addressed to Mr. Dude, succinctly outlined the deal structure.  Mr. Lester proposed forming a limited liability company, which would purchase the Property from Dee Investments for $3,800,000.00 net of closing costs.  Approximately $2,500,000.00 of this $3,800,000.00 would be used to satisfy the three existing liens on the Property, including the WAMU Deed of Trust.  The Defendant would acquire a 53.34 percent ownership stake in the new limited liability company in exchange for an $800,000.00 capital contribution[6], with Mr. Lester and his acquaintance Paul Doran acquiring the remaining membership interests after making a combined capital contribution of $700,000.00.  Mr. Lester sent a third email to the Defendant's email address on January 20, 2006 outlining the deal structure.  In this third email, Mr. Lester stated that he would act as the managing member for the new limited liability company.  On January 18, 19, and 20, 2006, Mr. Lester had several telephone conversations with the Defendant, individually and together with Mr. Dude, regarding the Defendant's membership in the proposed limited liability company, the Defendant's $800,000.00 capital contribution, and the approximately $2,500,000.00 in liens encumbering the Property.  Following several subsequent telephone negotiations involving Mr. Lester, the Defendant, and Mr. Dude, Mr. Lester sent an email to the Defendant's email address, addressed to the Defendant and Mr. Dude, confirming that the new limited

---

[5] The email address deevondude@aol.com belonged to the Defendant but was used by both the Defendant and Mr. Dude.
[6] The Defendant's capital contribution would consist of the $800,000.00 left in the deal after satisfaction of the existing encumbrances and the Defendant's receipt of $500,000.00 in cash.

liability company would purchase the Property for $3,850,000.00 net after closing costs. Mr. Lester then drafted a purchase contract wherein Mr. Lester, on behalf of the new limited liability company, would purchase the Property from Dee Investments for $4,140,000.00 gross (in order to net $3,850,000.00). On February 2, 2006, the Defendant signed this purchase contract on behalf of Dee Holdings as general partner of Dee Investments.

Mr. Lester then sought to obtain a title insurance policy underwritten by the Plaintiff to protect Mr. Lester's purchase of the Property. Stewart Colorado, through its title examiner Mr. Dorn, performed an examination of the Property's title. Because of Stewart Colorado's procedures regarding starter policies, Mr. Dorn's examination started with July 8, 2003, the date of the Wells Fargo Policy. Stewart Colorado once again did not discover the WAMU Deed of Trust encumbering the Property.

On February 2, 2006, Stewart Colorado made a commitment, bearing file number 44624, to issue a $4,140,000.00 title insurance policy underwritten by the Plaintiff as to the Property for the benefit of Mr. Lester (the "Lester Title Commitment"). The Lester Title Commitment stated that it was conditioned upon the satisfaction of the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust, but made no mention of the still undiscovered WAMU Deed of Trust.

When Mr. Lester received the Lester Title Commitment, he noticed that the listed encumbrances were approximately $1,800,000.00 short of the $2,500,000.00 in encumbrances on the Property that Mr. Lester had discussed with the Defendant and Mr. Dude. Mr. Lester forwarded a copy of the Lester Title Commitment to the Defendant and Mr. Dude and subsequently engaged in a telephone conference call with the Defendant and Mr. Dude to discuss this $1,800,000.00 discrepancy. During this conference call, both the Defendant and Mr. Dude acknowledged to Mr. Lester that the Lester Title Commitment

was missing an encumbrance on the Property of approximately $1,800,000.00. On this conference call, after Mr. Lester stated that the $1,800,000.00 discrepancy could cause a serious problem with the proposed purchase of the Property, the Defendant and Mr. Dude assured Mr. Lester that the Defendant and Mr. Dude would pay off the lien represented by the WAMU Deed of Trust.

By February 8, 2006, the original plan to remodel and sell the Property was unraveling after the Defendant: (a) stated that she would invest only $700,000.00; (b) refused to sign a personal guarantee for the loan to be used to buy the Property; and (c) balked at providing personal financial information to the bank that was to lend the money to finance the deal. On February 15, 2006, the Defendant sent an email to Mr. Lester, stating, in pertinent part and in original form, that the Defendant

> did not want to want to appear stubborn but the request from adam [who had requested financial information on behalf of the proposed lender bank] cannot be followed up by me because tax returns for the last three years will not be completed before September . i never made a financial statement. i can list you what i own which is the following and in my opinion their value :
>
> 1.      600 NORTH 3RD STREET ASPEN, with loans together $2,550,000.00
>
> * * *
>
> my background is college educated real estate investor, worked for donald trump for 8 years at mar-a-lago club, until my marriage to herald, with this information i can always sign for, please forward to adam. thanks, dee

In this email, among other things, the Defendant specifically stated that the Property was subject to loans aggregating $2,550,000.00, which necessarily included the loan secured by the WAMU Deed of Trust.

On or about February 20, 2006, Mr. Lester flew from Aspen to West Palm Beach in hopes of salvaging the plan to remodel and sell the Property. That evening he met with the Defendant and Mr. Dude at their home. When it appeared that the plan to remodel and sell the Property would not go forward, Mr. Lester proposed to the Defendant and Mr. Dude

12

that Mr. Lester purchase the Property outright for $4,140,000.00 gross. The Defendant and Mr. Dude indicated their agreement to this transaction. When Mr. Lester brought up the $1,800,000.00 encumbrance discrepancy on the Lester Title commitment, the Defendant and Mr. Dude assured Mr. Lester that the WAMU Deed of Trust would be taken care of and asked Mr. Lester not to inform Stewart Colorado about this discrepancy.

Before Mr. Lester flew to West Palm Beach to meet with the Defendant and Mr. Dude, Mr. Lester was contacted by real estate broker Lori Burnstine who represented a client, Rosina Lee Yue ("Ms. Yue"), interested in purchasing the Property. Mr. Lester did not inform the Defendant or Mr. Dude about Ms. Yue's purchase inquiry.

On or about February 24, 2006, Mr. Lester contacted Stewart Colorado regarding title insurance on the Property, for the benefit of Ms. Yue, to be underwritten by the Plaintiff. On or about February 24, 2006, Stewart Colorado, through its title examiner Mr. Dorn, performed an examination of the Property's title, this time back to February 2, 2006 (the date of the Lester Title Commitment). Once again, Stewart Colorado did not discover the WAMU Deed of Trust. On or about February 24, 2006, Stewart Colorado made a commitment, bearing file number 44624A-C2, to issue a $4,555,000.00 title insurance policy underwritten by the Plaintiff as to the Property for the benefit of Ms. Yue (the "Yue Title Commitment"). The Yue Title Commitment stated that it was conditioned upon the satisfaction of the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust, but made no mention of the still undiscovered WAMU Deed of Trust.

On February 27, 2006, without the knowledge of the Defendant or Mr. Dude, Mr. Lester and Ms. Yue executed a contract for Mr. Lester to sell the Property to Ms. Yue for $4,555,000.00.

The closings of the sale of the Property from Dee Investments to Mr. Lester and then from Mr. Lester to Ms. Yue occurred in mid-March 2006. On March 13, 2006, Drucilla Dorn

13

("Ms. Dorn"), an escrow officer for Stewart Colorado, sent a package of closing documents

(the "Closing Package") to the Defendant for the Defendant to execute and send via FedEx

back to Stewart Colorado.  The Closing Package contained several documents, including

those labeled "Closing Instructions", "Vesting Deed", "Bill of Sale", and "Indemnity and

Affidavit as to Debts, Liens, and Possession".

On March 14, 2006, the Defendant executed the Indemnity and Affidavit as to

Debts, Liens, and Possession (the "Defendant Affidavit") in connection with the closing on

the sale of the Property from Dee Investments to Mr. Lester and associated issuance of title

insurance underwritten by the Plaintiff as to the Property.  The Defendant Affidavit bears

file number 44624 and states, in pertinent part:

> Dee Investments Limited Partnership, a Nevada limited partnership . . .
> represents to the purchaser and/or Lender in this transaction that there are
> . . . [n]o loans, unpaid judgments, or liens (including Federal or State Liens or
> Judgment Liens) and no unpaid governmental or associations taxes, charges
> or assessments of any kind on [the Property] except the following:

After this text the Defendant wrote in her own hand the word "NONE".  On the next page

of the Defendant Affidavit, the Defendant signed "as Denise Roberts as Partner of Dee

Investments Limited Partnership, a Nevada limited partnership" under the following

language:

> If any Deed of Trust Recorded against my property secures an open line of
> credit or a revolving line of credit, I/we affirm that I/we have not drawn
> additional funds from the line of credit since the date of the title payoff
> statement from my/our lender to Stewart Title.  I/we further agree and affirm
> that I/we will not make any further draws on the line of credit after the date
> of this affidavit.  I/we further affirm that I/we have not taken out any loans
> against our property other than those shown on the above referenced title
> commitment number.
>
> Indemnity:  I agree to pay on demand to the purchaser and or lender and/or
> title companies (including Stewart Title Guaranty Company) in this
> transaction, their successors and assigns, all amounts secured by any and all
> liens, claims or rights not shown above, together with all costs, loss and
> attorney's fees that said parties may incur in connection with such
> unmentioned liens, provided said liens, claims, or rights either currently

14

> apply to such property, or a part thereof, or are subsequently established against said property and are created by me, known by me, or have an inception or attachment date prior to the closing of this transaction and recording of the deed and mortgage.
>
> I realize that the purchaser and/or Lender and Title Companies in this transaction are relying on the representations contained herein in purchasing same or lending money thereon and issuing title policies and would not purchase same or lend money or issue a title policy thereon unless said representations were made.   If Seller or Borrower is an entity, I have authority to sign on its behalf.

The Defendant Affidavit did not contain a choice of law provision.  In her capacity as "Partner of Dee Investments Limited Partnership, a Nevada limited partnership", the Defendant executed the other documents in the Closing Package on or about March 14, 2006.  These documents included: (a) the Closing Instructions, in which the Defendant directed that the proceeds from the sale of the Property by Dee Investments to Mr. Lester be wired to the Defendant's personal Citibank, F.S.B. account; (b) the Warranty Deed conveying the Property from Dee Investments to Mr. Lester; and (c) a related Bill of Sale.

On March 17, 2006, Mr. Lester executed the Indemnity and Affidavit as to Debts, Liens, and Possession (the "Lester Affidavit") in connection with the closing on the sale of the Property from Mr. Lester to Ms. Yue, which references file number 44624 and is substantially identical to the Defendant Affidavit.  The Lester Affidavit states, in pertinent part:

> David Lester . . . represents to the purchaser and/or Lender in this transaction that there are   . . . [n]o loans, unpaid judgments, or liens (including Federal or State Liens or Judgment Liens) and no unpaid governmental or associations taxes, charges or assessments of any kind on [the Property] except the following:

After this text Mr. Lester wrote in his own hand the word "NONE".

On March 17, 2006 at 11:25 p.m., the Warranty Deed conveying the Property from Dee Investments to Mr. Lester was recorded with the Clerk.  On March 17, 2006 at 11:26 p.m., Stewart Colorado issued a $4,140,000.00 title insurance policy underwritten by the

Plaintiff as to the Property for the benefit of Mr. Lester (the "Lester Policy").  The WAMU Deed of Trust was not excepted from coverage under the Lester Policy.

On March 17, 2006 at 11:28 p.m., a warranty deed conveying the property from Mr. Lester to Ms. Yue was recorded with the Clerk.  On March 17, 2006 at 11:29 p.m., a deed of trust in favor of UBS Mortgage (the "UBS Deed of Trust") in the principal amount of $3,000,000.00 was recorded with the Clerk against the Property, thereby securing a $3,000,000.00 note made by Ms. Yue to finance her purchase of the Property.  The UBS Deed of Trust was assigned to Wells Fargo Bank, N.A. shortly thereafter.  On March 20, 2006 at 2:45 p.m., Stewart Colorado issued a $4,555,000.00 title insurance policy underwritten by the Plaintiff as to the Property for the benefit of Ms. Yue (the "Yue Policy").  Pursuant to the Yue Policy, the Plaintiff insured Ms. Yue "against loss or damage, not exceeding [$4,555,000.00], sustained or incurred by [Ms. Yue] by reason of   . . . [a]ny defect in or lien or encumbrance on the title" of the Property not excepted from coverage, as well as "costs, attorney's fees and expenses incurred in defense of the title . . . ."  The WAMU Deed of Trust was not excepted from coverage under the Yue Policy.

Stewart Colorado, acting through Mr. Dorn, relied on the representations made in the Dude Affidavit, the Defendant Affidavit, and the Lester Affidavit when he caused Stewart Colorado to issue the Yue Policy.  Mr. Dorn would not have caused Stewart Colorado to issue the Yue Policy underwritten by the Plaintiff—Mr. Dorn would instead have stopped the whole closing process—if any of the Dude Affidavit, the Defendant Affidavit, or the Lester Affidavit had disclosed the WAMU Deed of Trust.

Upon the closing of the sale of the Property from Dee Investments to Mr. Lester on March 17, 2006, Stewart Colorado wired the net sum of $3,334,308.50[7], after closing costs and satisfaction of the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust, to the Defendant per the Defendant's instructions. The Defendant directly benefitted from her intentional failure to disclose the WAMU Deed of Trust to the Plaintiff in that she personally received sale proceeds, in the amount of $1,839,172.72[8], that would have otherwise been paid in satisfaction of the WAMU Deed of Trust.

The Court found the testimony of Mr. Dorn, Mr. Stelljes, and Mr. Lester credible. The same cannot be said of the Defendant's May 11, 2009 deposition testimony, admitted at trial in lieu of live testimony pursuant to agreement of the parties,[9] in which the Defendant, among other things: (a) denied all involvement in, and knowledge of, the various plans with Mr. Lester regarding the Property; (b) denied knowledge of the details of the sale of the Property by Dee Investments to Mr. Lester; (c) denied knowledge of the over $3,000,000.00 in Property sale proceeds received into the Defendant's personal bank account; (d) denied knowledge of, and involvement in, both Dee Investments and Dee Holdings; (e) denied knowledge of the WAMU Deed of Trust; (f) acknowledged that the

[7]Although the Seller's Final Closing Statement at Exhibit 97 states that the Defendant was to receive a net of $3,122,949.73, the confirmation of the wire from Stewart Colorado to the Defendant at Exhibit 109 shows that the Defendant actually received $3,334,808.50.
[8] The Plaintiff presented no evidence of the amount outstanding on the WAMU Note in March 2006 when the Defendant received the sale proceeds. This is in spite of the fact that, in Count III, the Plaintiff seeks relief against the Defendant on a theory of unjust enrichment which would require the Plaintiff to show the actual benefit obtained by the Defendant as a result of the Defendant's misrepresentation to the Plaintiff. This oversight is all the more perplexing because the Plaintiff presented evidence of the amount outstanding on the WAMU Note on dates before (Exhibit Nos. 106 and 132) and after (Exhibit No. 106) March 2006. However, the parties stipulated that "[t]he amount of unpaid principal (not including interest, costs, or fees) owed by Harald Dude under the terms of the Washington Mutual Adjustable Rate Note dated May 29, 2003, was and is $1,839,172.72." ECF No. 101, ¶41. The Court is without evidence as to the amount of unpaid interest on the WAMU Note on the relevant date and therefore addresses only the principal balance. Thus, the Court finds that the outstanding balance of the WAMU Note in March 2006 when the Defendant received the Property sale proceeds was $1,839,172.72.
[9] The full video and transcript were admitted as Exhibit No. 194, while the excerpted video was admitted as Exhibit No. 206.

email address deevondude@aol.com belonged to the Defendant, but claimed that Mr. Dude and not the Defendant had utilized it at all relevant times; and (g) denied receiving the Closing Package.  These claims are contradicted by Mr. Lester's testimony, the documentary evidence, later portions of the Defendant's May 11, 2009 deposition testimony, and the Defendant's prior deposition testimony.  To put it plainly, the Defendant's testimony was not credible on any material issue in this case.

On or about November 8, 2006, Ms. Yue sent a letter to the Plaintiff informing the Plaintiff that WAMU was foreclosing on the WAMU Deed of Trust and asserting a claim against the Plaintiff pursuant to the Yue Policy.  At that time, the outstanding principal balance of the WAMU Note totaled $1,839,172.72.  Attorney Judith Bregman ("Ms. Bregman"), claims counsel for the Plaintiff, received Ms. Yue's letter asserting a claim and began to investigate.  Ms. Bregman first determined that the WAMU Deed of Trust was not excepted from coverage under the Yue Policy.  After examining the WAMU Deed of Trust recorded with the Clerk on June 4, 2003 and seeing that it did not contain a legal description of the Property, Ms. Bregman hired outside counsel on behalf of the Plaintiff to obtain a legal opinion as to the validity of the lien created by the WAMU Deed of Trust. Based upon Ms. Bregman's own experience, as well as the opinion of outside counsel, Ms. Bregman determined that the WAMU Deed of Trust had created a valid lien on the Property.  Accordingly, the Plaintiff concluded that it was liable to Ms. Yue under the Yue Policy.

The WAMU Deed of Trust, this time with a legal description of the Property, was re-recorded with the Clerk on March 16, 2007.  Due to additional costs and fees, the Plaintiff agreed to pay WAMU $1,950,000.00 to satisfy the WAMU Note.  On May 24, 2007, the Plaintiff issued a $1,950,000.00 check to WAMU.  In exchange for the $1,950,000.00 check,

WAMU assigned the WAMU Deed of Trust to the Plaintiff.  The Plaintiff subsequently released the WAMU Deed of Trust.

On October 7, 2007, the Plaintiff sent a letter (the "Demand Letter") addressed to Dee Investments, the Defendant, and Mr. Dude demanding that Dee Investments, the Defendant, and Mr. Dude pay the Plaintiff, within seven days, "all amounts secured by the [WAMU Deed of Trust], as well as all costs, loss and attorney's fees that [the Plaintiff] has incurred and continues to suffer in connection with the [WAMU Deed of Trust]" pursuant to the Defendant Affidavit and the Dude Affidavit.  The Plaintiff did not receive any sum from Dee Investments, the Defendant, or Mr. Dude as demanded.

On June 11, 2011, the Defendant filed a petition under chapter 11 of the United States Bankruptcy Code.  The Defendant listed on her Schedule F, as contingent, unliquidated, and disputed, a $1,950,000.00 debt to the Plaintiff. ECF No. 18, p. 21.  On October 26, 2011, the Plaintiff filed unsecured Claim No. 11-1 in the amount of $1,950,000.00 (the "Claim").

The Plaintiff sued Mr. Dude, the Defendant, and Dee Investments in the United States District Court for the District of Colorado (the "District Court").  As a result of her bankruptcy filing, the action was stayed as to the Defendant.  After a jury trial conducted in June, 2011, the District Court entered judgment (the "District Court Judgment") in favor of the Plaintiff and against Mr. Dude and Dee Investments for fraud and breach of indemnity.  The District Court awarded the Plaintiff $1,950,000.00 in damages against Mr. Dude and Dee Investments on a joint and several basis.  In addition, the District Court awarded $975,000.00 in punitive damages against Dee Investments as a result of fraud.[10]

---

[10] The District Court awarded the $975,000.00 in punitive damages after the jury awarded the same amount and answered the following question in the affirmative:  "If you find for Stewart Guaranty on its claim of fraud against Dee Investments, then you must determine whether Stewart Guaranty

The District Court assessed post-judgment interest on the entire award at 0.18 percent per annum.

## II.    CONCLUSIONS OF LAW

In Counts I through IV of the Complaint, the Plaintiff seeks to establish, liquidate, and allow the Claim pursuant to § 502.  In Count V of the Complaint, the Plaintiff seeks a judgment that the Claim is excepted from discharge in this case.

§ 502 states, in pertinent part:

(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest, including a creditor of a general partner in a partnership that is a debtor in a case under chapter 7 of this title, objects.

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount . . . .

In addition to the Plaintiff's filed proof of claim, the Plaintiff presents its Claim for liquidation in this adversary proceeding, requesting a declaratory judgment that the Claim is to be allowed.  This is often the case in dischargeability actions when a plaintiff's claim was not liquidated in another court prior to the bankruptcy case.  The Defendant's answer and defense in this action are the functional equivalent of an objection to the Claim.

"What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed is a question which, in the absence of overruling federal law, is to be determined by reference to state law." *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161 (1946).  The parties agree that Colorado law applies,

---

proved beyond a reasonable doubt that Dee Investments should be required to pay punitive damages." Exhibit No. 210, Verdict, 6/23/11, pp.3-4, ¶¶15-16.

and the Court will generally apply Colorado law in its analysis of Counts I through IV.[11]

However, as explained in Section II.A below, the Court will apply Nevada law with regard

to the liability of the Defendant for the financial obligations of Dee Investments as a result

of her status as a general partner of that entity.

### A.    Establishment, Liquidation, and Allowance of Fraud Claim

In Count I of the Complaint, the Plaintiff seeks to establish, liquidate, and allow the

Claim against the Defendant based on fraud.  To prevail on Count I, the Plaintiff must

prove that: (1) the Defendant made a false representation regarding a material fact; (2) the

Defendant knew her representation was false; (3) the Plaintiff did not know the

Defendant's representation was false; (4) the Defendant intended that the Plaintiff rely on

the Defendant's false representation; (5) the Plaintiff actually and justifiably relied on the

Defendant's false representation; and (6) the Plaintiff's reliance on the Defendant's false

representation damaged the Plaintiff. *Loveland Essential Group, LLC v. Grommon Farms,*

*Inc.*, 251 P.3d 1109, 1116 (Colo. App. 2010) (citing *Coors v. Sec. Life of Denver Ins. Co.*, 112

P.3d 59, 66 (Colo. 2005)).  To prevail on Count I, the Plaintiff must prove all of the elements

of fraud by a preponderance of the evidence. *See Kopeikin v. Merch. Mortg. And Trust Corp.*,

679 P.2d 599, 601 (Colo. 1984).

The Defendant represented on March 14, 2006 in the Defendant Affidavit that there

were no liens on the Property other than the Furr and Cohen Deed of Trust and the Wells

Fargo Deed of Trust listed on the Lester Title Commitment.[12]  This representation was

---

[11] In its post-trial brief, the Plaintiff states, without elaboration, that "[e]ach of [Counts I through IV]
is controlled by Colorado law." ECF No. 186, p.13.  In her post-trial brief, the Defendant cites only
Colorado law in support of her contention that each of Counts I through IV in the Complaint must be
dismissed. ECF No. 189, p.10, ¶10.  Neither party suggested that any other state law applied to
Counts I through IV.
[12] The Defendant did not represent in the Defendant Affidavit that there were absolutely <u>no</u> liens on
the Property.  Rather, the Defendant represented that there were no liens other than those shown on
the Lester Title Commitment.

material and false.  As evidenced by the Defendant's telephone conversations, in-person conversations, and email exchanges with Mr. Lester, the Defendant knew at the time she signed the Defendant Affidavit of the WAMU Deed of Trust encumbering the Property and that the Defendant's representation that there were no liens on the Property other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust was false.  Although the Plaintiff, through its agent Stewart Colorado, had investigated the title of the Property, the Plaintiff did not know that the Defendant's representation was false.  As evidenced by the fact that: (a) the Defendant Affidavit makes clear on its face that the Plaintiff would rely on the Defendant's representations made therein; (b) the Defendant asked Mr. Lester not to inform the Plaintiff's agent Stewart Colorado about the WAMU Deed of Trust; and (c) the Defendant personally received and retained over $1,800,000.00 in additional closing proceeds due to the Plaintiff's ignorance of the WAMU Deed of Trust, the Defendant intended for the Plaintiff to rely on the Defendant's representation that there were no liens on the Property except for the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust.  The Plaintiff actually relied on the Defendant Affidavit as part of its investigation into the Property's title and would not have underwritten the Yue Policy if the Defendant Affidavit had disclosed the WAMU Deed of Trust.

The Plaintiff was damaged as a result of its reliance on the Defendant's false representation when the Plaintiff paid $1,950,000.00 to WAMU in order to satisfy the Plaintiff's resulting liability on the Yue Policy.  A plaintiff may recover all damages naturally and proximately caused by a fraudulent misrepresentation. *See Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 677 (Colo. 1994).  "An act is the proximate cause of an injury if the act was a substantial contributing cause in bringing about the injury." *Fed. Deposit Ins. Corp. v. Refco Group, Ltd.*, 989 F. Supp. 1052, 1068 (D. Colo. 1997) (internal quotation marks omitted).  A substantial contributing cause "is defined as conduct of sufficient

significance in producing the harm as to lead reasonable persons to regard it as a cause and to attach responsibility." *Refco*, 989 F. Supp. at 1068 (internal quotation marks omitted). "If a defendant's conduct is "a substantial contributing cause of the injury, it is irrelevant to the causation analysis whether other factors . . . also contributed to the injury." *Id.* at 1068 (internal quotation marks omitted).  The purpose of the Defendant Affidavit was to alert the Plaintiff of any unknown liens encumbering the Property.  The Defendant's false representation that there were no liens on the Property other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust is a substantial contributing, and actual, cause of the Plaintiff underwriting the Yue Policy which did not except the WAMU Deed of Trust from coverage.

When Ms. Yue[13] submitted her claim against the Plaintiff, the Plaintiff determined that that WAMU Deed of Trust created a valid lien on the Property and that the Plaintiff was obligated to clear the WAMU Deed of Trust from the Property's title pursuant to the Yue Policy.  The fact that, after the Plaintiff made this determination and expended $1,950,000.00, the Colorado Supreme Court issued its decision in *In re Rivera*[14] casting doubt on whether the WAMU Deed of Trust was in fact valid does not break the chain of natural and proximate causation leading from the Defendant's misrepresentation to the Plaintiff's injury.  The Defendant argues that, in light of *In re Rivera*, the Plaintiff should have known that the WAMU Deed of Trust was not valid, should not have paid on the Yue Policy, and should be prohibited from pursuing the Defendant.  But the Plaintiff did not

---

[13] The fact that the Plaintiff paid on the Yue Policy, and not the Lester Policy, makes no difference here.  The language of the Defendant Affidavit does not limit the application of the Defendant's representations made therein to the issuance of the Lester Policy.  Indeed, the Defendant Affidavit states that the affiant "realize(s) that the purchaser and/or Lender and Title Companies in this transaction are relying on the representations contained herein in purchasing same or lending money thereon and issuing title <u>policies</u> and would not purchase same or lend money or issue a title policy thereon unless said representations were made." (emphasis supplied).  The Plaintiff was entitled to and did rely on the Defendant Affidavit—the affidavit of a general partner of a former owner of the Property—in its title investigation in connection with the issuance of the Yue Policy.
[14] *Sender v. Cygan (In re Rivera)*, 2012 WL 1994873 (Colo. June 4, 2012).

have access to a time-traveling DeLorean DMC-12[15] and thus did not foresee that the

Colorado Supreme Court would hold, five years later in a case of first impression, "that a

recorded deed of trust that completely omits a legal description is defectively recorded and

cannot provide constructive notice to a subsequent purchaser of another party's security

interest in the property." *In re Rivera*, 2012 WL 1994873, at *2 (Colo. June 4, 2012).

Rather, the Plaintiff researched the issue at the time and reasonably determined that the

WAMU Deed of Trust was valid.[16]  The Defendant's misrepresentation that there were no

liens on the Property other than the Furr and Cohen Deed of Trust and the Wells Fargo

Deed of Trust is the natural and proximate cause of the Plaintiff's damages.

Although the Defendant signed the Defendant Affidavit in a representative capacity,

as "Denise Roberts as Partner of Dee Investments Limited Partnership, a Nevada limited

partnership", the Defendant is personally liable to the Plaintiff if the Plaintiff proves all of

the elements of fraud. *See* NEV. REV. STAT. § 87A.355(1) ("Each general partner is an agent

of the limited partnership for the purposes of its activities."); *see Galie v. Ram Assoc. Mgmt.

Serv., Inc.*, 757 P.2d 176, 177 (Colo. App. 1988) ("[A]n agent may be held personally liable

for torts committed by him including his own misrepresentations, even though the tortious

acts were done on behalf of his principal.").

The ultimate question in this case is whether the Plaintiff's reliance on the

Defendant Affidavit was justifiable.  In determining whether a party justifiably relied on

another's misrepresentation, the question is not whether an ordinary or reasonably prudent

---

[15] "The DeLorean DMC-12, most commonly referred to as simply the 'DeLorean,' is a sports car which was manufactured by the DeLorean Motor Company for the American market in 1981 and 1982.  The DeLorean first received mainstream notoriety when it appeared in the Back to the Future films, staring Michael J. Fox and Christopher Lloyd, as a homemade time machine." *U.S. v. $5,173.00 in U.S. Currency*, 2008 WL 4280369, at *5 n.3 (M.D. Ga. Sept. 16, 2008) (citation omitted).
[16] There is no suggestion in this case that the Plaintiff's payment of $1,950,000.00 to WAMU was gratuitous or otherwise anything other than the result of settlement reached after a good faith, arms-length negotiation and resolution of a *bona fide* dispute.

man would have relied, but whether the particular plaintiff, given his "mentality, awareness and experience," had the right to rely. *See Zimmerman v. Loose*, 425 P.2d 803, 88-89 (Colo. 1967). The Court must examine whether, based on this particular Plaintiff's mentality, awareness, intelligence, education, and experience, the Defendant's misrepresentation should have raised "substantial questions" as to whether the Property was encumbered by a lien other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust. *See Monte Verde v. Moore*, 539 P.2d 1362, 1365 (Colo. App. 1975). If such substantial questions should have been raised, that is, if the Plaintiff was placed on inquiry notice as to the veracity of the Defendant's representation, the Plaintiff "was bound to inquire and examine into its correctness". *See M.D.C./Wood, Inc. v. Mortimer*, 866 P.2d 1380, 1383 (Colo. 1994) (internal quotation marks omitted). Once on inquiry notice, if the Plaintiff had "access to information that was equally available to both parties and would have led to the true facts," then the Plaintiff did not justifiably rely on the Defendant's misrepresentation. *See M.D.C./Wood, Inc. v. Mortimer*, 866, P.2d at 1382. The more sophisticated an individual is, the greater the challenge in proving the individual justifiably relied on a misrepresentation. *See J.A. Walker Co., Inc. v. Cambria Corp.*, 159 P.3d 126, 129 (Colo. 2007).

Looking to the Colorado Supreme Court's recent decision in *In re Rivera*, because the WAMU Deed of Trust was defectively recorded without a legal description, it did not by itself put the Plaintiff on inquiry notice. *In re Rivera*, 2012 WL 1994873, at *7 ("[B]ecause the deed of trust . . . was defectively recorded, we cannot conclude that it triggered any duty to inquire."). The Defendant is correct to this extent. But *In re Rivera* does not stand for the proposition that a plaintiff pursuing a fraud claim can never be placed on inquiry notice requiring him to further investigate and discover a deed of trust defectively recorded

without a legal description. *In re Rivera* involved a bankruptcy trustee seeking to avoid a deed of trust on the debtor's property under § 544(a)(3). This so-called strong arm power provides that "a bankruptcy trustee stands in the shoes of a bona fide purchaser of real property from the debtor, and may avoid a security interest in the debtor's real property if a hypothetical bona fide purchaser could have acquired that property free and clear of the security interest at the time the bankruptcy case commenced." *Id.* at *3. In exercising the strong-arm power, the trustee enjoys the status of a hypothetical bona fide purchaser because the Bankruptcy Code provides that such power exists "without regard to any knowledge of the trustee or any other creditor . . . ." 11 U.S.C. § 544(a). Unlike the hypothetical case considered by the court in *In re Rivera*, where the knowledge of the plaintiff was circumscribed by statute, in the present case the Court may consider whether the Plaintiff had knowledge of other facts that would necessitate investigation and would have disclosed the WAMU Deed of Trust. *See In re Rivera*, 2012 WL 1994873, at *7 ("Although a real purchaser might have acquired knowledge of other facts sufficient to trigger a duty to inquire, and a reasonable investigation might have revealed the Defendants' encumbrance on the Debtor's property, such facts are not before us in this hypothetical purchaser setting.").

   The Plaintiff and its agent Stewart Colorado are sophisticated entities with extensive experience in underwriting and issuance of title insurance policies, performance of title examinations, and handling of real estate closings. It is their practice not to record an instrument and not to issue a pending title insurance policy related thereto, without further review and/or modification, when a previously unknown lien or encumbrance is discovered during a date down search. On July 8, 2003, the Plaintiff, through its agent Stewart Colorado, performed a date down search. This date down search would have revealed the June 4, 2003 quitclaim deed conveying the Property from Dee Investments to

26

Mr. Dude as well as the June 9, 2003 quitclaim deed from Mr. Dude back to Dee Investments. These transactions should have raised a suspicion on the part of the Plaintiff regarding whether Mr. Dude had encumbered the Property during his period of ownership. From its previous title examinations, the Plaintiff was aware of a prior instance where Mr. Dude: (a) caused Dee Investments to convey the Property to himself via quitclaim deed (on July 8, 2003 at 3:53 p.m.); (b) encumbered the Property (the Wells Fargo Deed of Trust) minutes later; and (c) re-conveyed the Property back to Dee Investments shortly thereafter (July 8, 2003 at 3:58 p.m.). In light of the Plaintiff's awareness of these facts, taking into account its special skill and experience in title matters, the Plaintiff should have had substantial questions as to the veracity of the Defendant Affidavit.

Accordingly, the Plaintiff was bound to inquire into and examine the correctness of the Defendant's representation that the Property was not encumbered by other liens. Once placed on inquiry notice, the Plaintiff had access to information that was equally available to both parties—the Clerk's database. If the Plaintiff properly followed the title trail, it would have led the Plaintiff to discover the truth—that the Defendant was lying and the WAMU Deed of Trust encumbered the Property. The Plaintiff did not justifiably rely on the Defendant's representation in the Defendant Affidavit that no liens encumbered the Property other than the Furr and Cohen Deed of Trust and the Washington Mutual Deed of Trust.[17]

Although the Plaintiff did not prove a claim against the Defendant, directly, under the theory of fraud, the Defendant is nonetheless liable to the Plaintiff as a result of her misrepresentation on behalf of Dee Investments. The District Court entered a

---

[17] The Court is mindful that this conclusion differs from that reached by the District Court after a jury trial against Dee Investments and Mr. Dude, based on substantially the same Colorado fraud claim. The present matter involved independent presentation of evidence against a different defendant before a different trier of fact. The Plaintiff has the burden of proof on all aspects of this adversary proceeding and it did not meet that burden of proof on this component of the cause.

$2,925,000.00 judgment against Dee Investments for fraud based on the Defendant Affidavit.  At trial here and in its post-trial brief, the Plaintiff asserted that the Defendant, as a general partner of Dee Investments, is personally liable to the Plaintiff for the debt represented by the District Court Judgment.  Dee Investments is a Nevada limited partnership.[18]  Under Nevada law, "all general partners are liable jointly and severally for all obligations of the limited partnership unless otherwise agreed by the claimant or provided by law." NEV. REV. STAT. § 87A.365(1).  Consequently, the Plaintiff has a claim against the Defendant in the same amount awarded in the District Court Judgment, $2,925,000.00.

It does not matter that the Complaint failed to present this theory for relief.  The Plaintiff presented the relevant evidence—the jury verdict and the resulting District Court Judgment—and the Defendant did not object to their admission.   The Plaintiff argued the matter at trial.  The Defendant failed to object at trial.  The issue is properly before the Court.[19]

The Court will enter judgment in favor of the Plaintiff on Count I of the Complaint, allowing the Plaintiff's Claim as an unsecured claim in the amount of the $2,925,000.00.

---

[18] In support of its assertion, the Plaintiff cites two cases addressing Colorado partnership law. Under Colorado law, "a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners[.]" COLO. REV. STAT. § 7-62-403(2)(a)(I).  Thus, a general partner of a Colorado limited partnership is liable "[j]ointly and severally for all . . . debts and obligations of the partnership . . . ." COLO. REV. STAT. § 7-60-115(1)(b).  However, Dee Investments is a Nevada limited partnership and the Court must look to applicable Nevada partnership law to determine if the Defendant is personally liable as a general partner of Dee Investments for the debt represented by the District Court Judgment. *See Pioneer Inv. Serv. Co. v. The Cane P'ship, Ltd. (In re Pioneer Inv. Serv. Co.)*, 141 B.R. 635, 647-48 (Bankr. E.D. Tenn. 1992) (applying law of state where limited partnership was formed to determine liability of partners for acts and obligations of limited partnership).

[19] Fed. R. Civ. P. 15(b)(2) is made applicable to this proceeding by Fed. R. Bankr. P. 7015 and provides:  "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings.  A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue.  But failure to amend does not affect the result of the trial of that issue."

**B.        Establishment, Liquidation, and Allowance of Concealment Claim**

In Count II of the Complaint, the Plaintiff seeks to establish, liquidate, and allow the Claim against the Defendant based on concealment.  A concealment claim differs from a fraud claim only insofar as a material fact is concealed rather than misrepresented. *See Nielson v. Scott*, 53 P.3d 777, 779-80 (Colo. App. 2002).  To prevail on Count II, the Plaintiff must prove all of the elements of concealment by a preponderance of the evidence. *See Kopeikin*, 679 P.2d at 601.

The Plaintiff must show that the Defendant had a duty in equity and good conscience to disclose to the Plaintiff that the WAMU Deed of Trust encumbered the Property. *Mallon Oil Co. v. Bowen/Edwards Associates, Inc.*, 965 P.2d 105, 111 (Colo. 1998).  "[O]ne party to a business transaction has a duty to disclose [to another party to the transaction] facts basic to the transaction when objective circumstances create a reasonable expectation of disclosure of those facts[.]" *Mallon Oil Co*, 965 P.3d at 111.  The plain language of the Defendant Affidavit, as well as the circumstances surrounding the issuance of title insurance as part of the transaction, meant that the Defendant had a duty to disclose to the Plaintiff, through its agent Stewart Colorado, the existence of the WAMU Deed of Trust encumbering the Property.

As with fraud, the Plaintiff must prove justifiable reliance.  Here, the Plaintiff must prove that the Plaintiff was justified in relying on its assumption that the Property was not encumbered by any liens other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust. *See Nielson v. Scott*, 53 P.3d at 780.  The Plaintiff proved all of the elements of concealment except for justifiable reliance.  For the reasons stated above in Section II.A, the Plaintiff was not justified in relying on its assumption that the Property was unencumbered by liens other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust.

The Plaintiff has not established the Claim under the theory of concealment, and the Court will enter judgment in favor of the Defendant as to Count II of the Complaint.

C.     **Establishment, Liquidation, and Allowance of Breach of Contract Claim**

In Count III of the Complaint, the Plaintiff seeks to establish, liquidate, and allow the Claim against the Defendant based on breach of contract. The Plaintiff alleges that the Plaintiff and Defendant entered into a contract—the Defendant Affidavit—and that the Defendant breached this contract by failing to indemnify the Plaintiff, resulting in damage to the Plaintiff in the amount it paid to satisfy Ms. Yue's claim under the Yue Policy.

It is not correct to state that the Plaintiff and Defendant, personally, entered into a contract. The Defendant signed the Defendant Affidavit in a representative capacity. To the extent there is a contract, it is between the Plaintiff and Dee Investments. Nevertheless, the Defendant may be liable for a breach of the Defendant Affidavit by Dee Investments. Under applicable Nevada law, a general partner is "liable jointly and severally for all obligations of a limited partnership . . . ." NEV. REV. STAT. § 87A.365(1). Thus, although the Defendant signed the Defendant Affidavit on behalf of Dee Investments, the Defendant is a general partner of Dee Investments and is liable for any breach of the Defendant Affidavit on the part of Dee Investments.

In the Complaint, the Plaintiff alleged a breach by the Defendant. There is no independent allegation that Dee Investments breached the Defendant Affidavit. Nor does the Complaint allege that the Defendant would be liable for such breach by Dee Investments. However, the fact that the Complaint does not carefully spell out this claim is not fatal to the Plaintiff's recovery. The Plaintiff presented the relevant evidence, the

Defendant failed to object at trial, and so the matter is properly before the Court.[20]   In any case, the Defendant conceded at trial that she could be personally subject to a claim for breach of contract in this action.[21]

To prevail on Count III, the Plaintiff must prove that: (1) a contract existed; (2) the Plaintiff performed under the contract; (3) Dee Investments failed to perform under the contract; and (4) Dee Investments' failure to perform resulted in damages to the Plaintiff. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). The Plaintiff must prove all of the elements of breach of contract by a preponderance of the evidence. *See* COLO. REV. STAT. § 13-25-127(1).  If there was a contract and it was breached by Dee Investments, then the Defendant is personally liable for such breach as she was a general partner of Dee Investments at all relevant times. NEV REV. STAT. § 87A.365(1).

The Defendant Affidavit is a contract between the Plaintiff and Dee Investments.  "A contract is formed when an offer is made and accepted and the agreement is supported by consideration.  Acceptance of an offer is generally defined as words or conduct that, when objectively viewed, manifests an intent to accept an offer." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008) (citations omitted).  Consideration is "a benefit received or something given up as agreed upon between the parties, [such as] . . . some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered or undertaken by the other[.]" *Compass Bank v. Kone*, 134 P.3d 500, 502 (Colo. App. 2006) (citations omitted) (internal quotation marks omitted).  Dee Investments sought to sell the Property.  As part of this transaction, the Plaintiff offered to

---

[20] Fed. R. Civ. P. 15(b)(2), made applicable to this proceeding by Fed. R. Bankr. P. 7015.
[21] At trial, Defendant's counsel stated "Now, is there a breach of contract here?  I think so.  I think that Denise Roberts is responsible under a breach of contract claim under that indemnity agreement and affidavit." [ECF No. 184, Trial Trans. 7/9/12, p. 61].  The Defendant's counsel also conceded that Dee Investments had breached the Defendant Affidavit, stating "There was simply an agreement to pay, which was breached by Dee Investments Limited Partnership." ECF No. 185, Trial Trans.7/10/12, p. 456.

issue policies of title insurance on the condition that Dee Investments fill out and sign the Defendant Affidavit, which includes an indemnity agreement. Thus, there was an offer and an acceptance supported by consideration.

The Plaintiff performed under the Defendant Affidavit by issuing policies of title insurance. Dee Investments failed to perform under the Defendant Affidavit. The WAMU Deed of Trust was known to the Defendant at the time she signed the Defendant Affidavit, and thus Dee Investments was obligated to indemnify the Plaintiff on the Plaintiff's demand. After the Plaintiff made such demand on Dee Investments, neither Dee Investments nor the Defendant paid the Plaintiff as demanded. Dee Investments' failure to perform damaged the Plaintiff in the amount of $1,950,000.00, the amount paid by the Plaintiff to clear title to the Property in satisfaction of Ms. Yue's title insurance claim. Thus, Dee Investments breached the Defendant Affidavit. The Defendant is liable for such breach.

The Plaintiff has established the Claim as also being a claim for breach of contract, and the Court will enter judgment in favor of the Plaintiff on Count III of the Complaint, allowing the Plaintiff's Claim as an unsecured claim in the amount of $2,588,345.78, consisting of $1,950,000.00 in damages plus pre-judgment interest in the amount of $638,345.78 as provided below in Section II.E of this Memorandum Opinion.

**D.    Establishment, Liquidation, and Allowance of Unjust Enrichment Claim**

In Count IV of the Complaint, the Plaintiff seeks to establish, liquidate, and allow the Claim against the Defendant based on unjust enrichment. To prevail on Count IV, the Plaintiff must prove that: "(1) at the expense of [the Plaintiff] (2) [the Defendant] received a benefit; (3) under circumstances making it unjust for [the Defendant] to retain the benefit without paying for it." *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App.

32

2009) (citing *Robinson v. Colorado State Lottery Div.*, 179 P.3d 998, 1007 (Colo. 2008)).

Unjust enrichment is an equitable restitution cause of action that entails a plaintiff's

recovery of the benefit received by a defendant. *Harris Group, Inc.*, 209 P.3d at 1205.  The

Plaintiff must prove all of the elements of unjust enrichment by a preponderance of the

evidence. *See* COLO. REV. STAT. § 13-25-127(1).

      Here, the Defendant received the benefit of additional net proceeds from the sale of

the Property in the amount of $1,839,172.72 which, absent the Defendant's intentional

misrepresentation, would have been used to pay off the WAMU Note and satisfy the

WAMU Deed of Trust.  This benefit came at the expense of the Plaintiff because the

Plaintiff was obligated to pay $1,950,000.00 to clear the WAMU Deed of Trust from the

Property's title in satisfaction of Ms. Yue's title insurance claim.  It would be unjust for the

Defendant to retain the extra proceeds from sale of the Property.  The Plaintiff satisfied the

elements of unjust enrichment.

      However, the Plaintiff is not entitled to affirmative recovery on this claim in the

present action.  Relief under the theory of unjust enrichment is an equitable remedy and is

not available when there is a "plain, speedy, [and] adequate remedy at law." *Harris Group,

Inc.*, 209 P.3d at 1205 (internal quotation marks omitted).  Generally, a party cannot

recover under an unjust enrichment theory when there is a parallel claim based on an

express contract. *See id.*  An express contract, the Defendant Affidavit, exists in the instant

case.  The Court has ruled, above, that the Plaintiff is entitled to recovery against the

Defendant as a result of breach of that contract.  Thus, the Plaintiff is not entitled to

judgment on the theory of unjust enrichment.

      Based solely on the fact that the Plaintiff has obtained recovery herein against the

Defendant on an action at law, the Plaintiff has not established its right to recovery on a

theory of unjust enrichment and the Court will enter judgment in favor of the Defendant as to Count III of the Complaint.

     **E.**     **Exemplary Damages, Attorneys' Fees, Costs, and Interest**

The Complaint includes in its general prayer for relief a request for attorneys' fees, costs, interest, and exemplary damages.

The Plaintiff presented no evidence with regard to the amount of attorneys' fees or costs incurred in this matter, and so no award is warranted.[22]

The Plaintiff's request for an award of exemplary damages appears to be grounded on the $975,000.00 in exemplary damages awarded in the District Court Judgment as a result of a jury verdict based on fraud against Dee Investments.  As stated in Section II.A above, such exemplary damages increase the fraud component of the Claim to $2,925,000.00, which will be allowed as an unsecured claim against the estate.  The Plaintiff presented no other basis for an award of exemplary damages, and so no additional exemplary damages are warranted.

"[E]ntitlement to pre-judgment interest is discretionary." *Pellegrino v. Metro Unlimited, Inc. (In re Dakhllalah)*, 2010 WL 148457, at *2 (Bankr. M.D. Fla. Jan. 7, 2010) (internal quotation marks omitted).  Although 28 U.S.C. § 1961 "mandates the rate for post-judgment interest . . . [t]here is no similar statute mandating the pre-judgment interest rate." *Smith v. Am. Int'l Life Assurance Co. of New York*, 50 F.3d 956, 958 (11th Cir. 1995).  As to state law causes of action established and liquidated by this Court, the Court may apply applicable state law to determine the pre-judgment interest rate. *See Pellegrino v. Metro Unlimited, Inc. (In re Dakhllalah)*, 2010 WL 148457, at *2.

Section 5-12-102 of the Colorado Revised Statutes provides, in pertinent part:

---

[22] The Court makes no ruling as to whether attorneys' fees or costs could have been awarded in this action if such evidence had been presented.

(1) Except as provided in section 13-21-101, C.R.S. [dealing with personal injury judgments], when there is no agreement as to the rate thereof, creditors shall receive interest as follows:

> (a) When money or property has been wrongfully withheld, interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property from the date of wrongful withholding to the date of payment or to the date judgment is entered, whichever first occurs; or, at the election of the claimant,

> (b) Interest shall be at the rate of eight percent per annum compounded annually for all moneys or the value of all property after they are wrongfully withheld or after they become due to the date of payment or to the date judgment is entered, whichever first occurs.

"Where a party breaches a contract by failing to make required payments, the money owed under the contract has been 'wrongfully withheld' for purposes of § 5–12-102(1)(a)." *Echo Acceptance Corp. v. Household Retail Serv., Inc.*, 267 F.3d 1068, 1092 (10th Cir. 2001). In order to receive a pre-judgment interest rate higher than 8 percent pursuant to Section 5-12-102(1)(a) of the Colorado Revised Statutes, "the claimant must *specifically* prove that the withholding party *actually* benefitted in an amount greater than eight percent per annum." *Echo Acceptance Corp.*, 267 F.3d at 1093 (internal quotation marks omitted) (emphasis in original).

The Court finds it appropriate to apply the foregoing Colorado law and award pre-judgment interest on the Claim to the extent based on breach of contract. The Plaintiff presented no evidence with regard to entitlement to pre-judgment interest at a rate greater than that provided by statute. Thus, as to the breach of contract component of the Claim, the Plaintiff is entitled to pre-judgment interest at eight percent (8%) per annum compounded annually from October 15, 2007 (the day after the last date for payment following the Plaintiff's demand) up to June 17, 2011 (the petition date in this case), or $638,345.78.

The District Court Judgment did not award interest for the period prior to the filing of the petition commencing this case.  To the extent this Court now allows the Claim based on the Defendant's liability for the obligations of Dee Investments under the District Court Judgment, no pre-judgment interest is awarded here.

The Plaintiff is not entitled to post-judgment interest on its pre-petition unsecured Claim. *See* 11 U.S.C. § 506(b); *see also In re Liuzzo*, 204 B.R. 235, 239 (Bankr. N.D. Fla. 1996).

### F.    Exception of Claim from Discharge Under § 523(a)(2)(A)

In Count V of the Complaint, the Plaintiff seeks to except from discharge in this case the Claim to the extent allowed by this Court.  The Plaintiff alleges that its damages were sustained as a result of the Defendant's false pretenses, false representations, and actual fraud.  Pursuant to §§ 1141(d)(2) and 523(a)(2)(A), a debt is not discharged if such debt is one "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud . . . ."

To prevail on Count V based on a false representation or actual fraud, the Plaintiff must prove that:  "(1) the [Defendant] made a false representation [intended] to deceive the [Plaintiff], (2) the [Plaintiff] relied on the misrepresentation, (3) the reliance was justified, and (4) the [Plaintiff] sustained a loss as a result of the misrepresentation." *Sec. Exch. Comm'n v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998).

False pretenses differs from false representation or actual fraud only in that: (a) the Plaintiff may prove either the Defendant's intent to deceive the Plaintiff or the Defendant's reckless indifference for the truth; and (b) rather than a false representation, the Plaintiff may prove the Defendant committed "any intentional fraud or deceit practiced by whatever method in whatever manner." *Taylor v. Wood (In re Wood)*, 245 F. App'x 916, 918 (11th Cir. 2007).

> The concept of false pretenses is especially broad . . . <u>False pretenses</u> may be implied from conduct or <u>may consist of concealment or non-disclosure where there is a duty to speak</u>, and may consist of any acts, work, symbol, or token calculated and intended to deceive . . . It is a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or a false and misleading understanding of a transaction, by which a creditor is wrongfully induced by a debtor to transfer property or extend credit to the debtor . . . <u>Silence or concealment as to a material fact can constitute false pretenses.</u>

*In re Wood*, 245 F. App'x at 918 (emphasis supplied). "What constitutes 'false pretenses' in the context of § 523(a)(2)(A) has been defined as 'implied misrepresentations or conduct intended to create and foster a false impression.'" *Ershowsky v. Freedman (In re Freedman)*, 431 B.R. 245, 256 (Bankr. S.D. Fla. 2010) (quoting *Memorial Hosp. v. Sarama (In re Sarama)*, 192 B.R. 922, 927 (Bankr. N.D. Ill. 1996) (internal quotation marks omitted).

The Plaintiff must prove all of the elements of § 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991). The Plaintiff has proven each element of actual fraud, false representation, and false pretenses[23] except for the element of justifiable reliance.

The Defendant's representation to the Plaintiff in the Defendant Affidavit that there were no liens encumbering the Property other than the Furr and Cohen Deed of Trust and the Wells Fargo Deed of Trust was false and intended to deceive the Plaintiff. The Defendant's telephone conversations, email exchanges, and in-person conversations with Mr. Lester show that the Defendant knew at the time she signed the Defendant Affidavit that the WAMU Deed of Trust encumbered the Property. The Defendant's conversation with Mr. Lester in which the Defendant asked Mr. Lester not to inform the Plaintiff about the WAMU Deed of Trust, together with the Defendant's large resulting financial gain,

---

[23] As discussed in Section II.B above, the Defendant had a duty under Colorado law to disclose to the Plaintiff that the WAMU Deed of Trust encumbered the Property. For purposes of the Court's § 523(a)(2)A) analysis, such non-disclosure is equivalent to the Plaintiff's direct misrepresentation in the Defendant Affidavit.

shows that the Defendant intended to deceive the Plaintiff regarding the existence of the WAMU Deed of Trust when the Defendant filled out and signed the Defendant Affidavit.

The Plaintiff actually relied on the Defendant's misrepresentation in the Defendant Affidavit when the Plaintiff underwrote the Yue Policy. The Plaintiff relied on the Defendant Affidavit as part of its investigation into the Property's title and would not have underwritten the Yue Policy if the Defendant Affidavit had disclosed the WAMU Deed of Trust.

The Plaintiff sustained a $1,950,000.00 loss as a result of the Defendant's misrepresentation. The Plaintiff was required to pay this amount to WAMU in order to satisfy Ms. Yue's title insurance claim. "Proof that the aggrieved party's damage was proximately caused by the debtors misrepresentation is required by 11 U.S.C. § 523(a)(2)(A)." *Lightner v. Loln*, 274 B.R. 545, 550 (M.D. Fla. 2002). Proximate cause exists when both actual causation and foreseeability are present. *Lightner v. Lohn*, 274 B.R. at 550. In the instant cause, the Plaintiff would not have underwritten the Yue Policy, and thus would not have sustained the resulting loss, but for the Defendant's misrepresentation that there were no liens encumbering the Property other than the Furr and Cohen Deed of Trust and the Washington Mutual Deed of Trust. Moreover, it was foreseeable that the Defendant's misrepresentation would damage the Plaintiff. The Defendant knew when the Defendant signed the Defendant Affidavit that the Plaintiff was unaware of the WAMU Deed of Trust and, as stated in the Defendant Affidavit, the Defendant was on notice that the Plaintiff was "relying on the representations contained herein in . . . issuing title policies and would not . . . issue a title policy [as to the Property] unless said representations were made." Therefore, Defendant's misrepresentation was a proximate cause of the Plaintiff's $1,950,000.00 loss.

However, in this case, the Plaintiff's reliance on the Defendant's misrepresentation was not justifiable.

In *Field v. Mans*, the Supreme Court addressed the nature of reliance necessary to support a claim under § 523(a)(2)(A). 516 U.S. 59, 61 (1995). Reviewing existing case law, the court considered three alternatives. *Field*, 516 U.S. 59, 72-73 (1995). The first potential test looked only to whether the plaintiff actually relied on the defendant's misrepresentation. *Id.* at 66-67. No other evidence of reliance would be necessary to prove the claim. *Id.* at 67. The second potential test considered whether, in addition to evidence of actual reliance, a reasonably prudent person would have relied on the defendant's misrepresentation. *Id.* at 63. Under such a test, the evidence would focus on the objective question whether a reasonable person would have acted in the same manner, without considering any particular aspects of the plaintiff itself. *Id.* at 77. The third potential test considered whether, again in addition to evidence of actual reliance, a person with the plaintiff's own qualities could justifiably rely on the defendant's misrepresentation. *Id.* at 70-71. This last test considered the actual experience and knowledge of the plaintiff, in addition to the circumstances of the particular case, to determine whether the plaintiff's reliance was justified. *Field*, 516 U.S. 59, 70-71 (1995). The Supreme Court determined that this last approach, justifiable reliance, was the appropriate approach to evaluate a claim under § 523(a)(2)(A). *Id.* at 61.

The Supreme Court then looked to the Restatement (Second) of Torts and several authoritative treatises to more clearly define the nature of justifiable reliance in this context. "'Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the applicable community standard of conduct for all cases.'" *Id.* at 71 (quoting Restatement (Second) of

Torts § 545A cmt. b (1977)).  The court noted that a plaintiff is "'required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" *Id.* (quoting Restatement (Second) of Torts § 541 cmt. a (1977)).  As to when such a cursory examination or inspection is required, the Supreme Court stated that:

> "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that [the plaintiff] is required to make an investigation of his own . . . the matter seems to turn upon an individual standard of the plaintiff's own capacity and the knowledge which he has or which may fairly be charged against him from the facts within his observation in light of his individual case."

*Id.* (quoting W. Prosser, <u>Law of Torts</u> § 108, pp. 717-718 (4th ed. 1971)).

Just prior to the Supreme Court's ruling in *Field*, the Eleventh Circuit likewise held that justifiable reliance was the appropriate standard under § 523(a)(2)(A). *City Bank & Trust Co. v. Vann (In re Vann)*, 67 F.3d 277, 281 (11th Cir. 1995).  The Eleventh Circuit also discussed the Restatement (Second) of Torts and several authoritative treatises, concluding that "'[a] victim who lacks access to the truth, and has not been alerted to the facts that would alert him to the truth, is not to be . . . blocked by a discharge under the bankruptcy laws—just because he did not conduct a more thorough investigation.'" *In re Vann.* 67 F.3d at 283 (quoting *Mayer v. Spanel Int'l Ltd. (In re Mayer)*, 51 F.3d 670, 676 (7th Cir. 1995)).  Simply put, "justifiable reliance requires [the plaintiff] to act appropriately according to his individual circumstances." *Id.* at 284.

*In re Vann* and *Field* provide the Court with ample guidance in determining whether the Plaintiff here justifiably relied on the Defendant's misrepresentation.  The Court must examine this particular Plaintiff's qualities, characteristics, and knowledge.  Knowledge may be charged to the Plaintiff from facts within the Plaintiff's observation.

Based upon the Plaintiff's qualities, characteristics, and knowledge, the Court must then determine whether the falsity of the Defendant's misrepresentation should have been apparent to the Plaintiff from a cursory glance or whether the Plaintiff discovered something which should have served as a warning that the Defendant's representation was false.  If either of these questions is answered in the affirmative, then the Plaintiff was required to undertake an investigation into the veracity of the Defendant's representation. If such investigation—again in light of this particular Plaintiff's qualities, characteristics, and knowledge—would have uncovered  facts showing the Defendant's statement to be false, the Plaintiff did not justifiably rely on the Defendant's misrepresentation.

The Plaintiff and its agent Stewart Colorado are sophisticated entities whose business and experience involve underwriting and issuance of title insurance policies, performance of title examinations, and handling of real estate closings.  On July 8, 2003, the Plaintiff, through its agent Stewart Colorado, performed a date down search.  This date down search would have revealed the June 4, 2003 quitclaim deed conveying the Property from Dee Investments to Mr. Dude and the June 9, 2003 quitclaim deed from Mr. Dude back to Dee Investments.  From its previous title examinations of the Property, the Plaintiff was aware of a prior instance where Mr. Dude: (a) caused Dee Investments to convey the Property to himself via quitclaim deed (on July 8, 2003 at 3:53 p.m.); (b) encumbered the Property (the Wells Fargo Deed of Trust) minutes later; and (c) re-conveyed the Property back to Dee Investments shortly thereafter (July 8, 2003 at 3:58 p.m.).  The Plaintiff's knowledge of both the June 4, 2003 quitclaim deed from Dee Investments to Mr. Dude and the June 9, 2003 quitclaim deed from Mr. Dude back to Dee Investments, coupled with the Plaintiff's knowledge of how the Wells Fargo Deed of Trust came to encumber the Property, served as a warning to this Plaintiff, a sophisticated title company, that the Defendant's

representation in the Defendant Affidavit that there were no unlisted encumbrances on the Property might be false.

Thus, the Plaintiff was required to undertake an investigation which would have entailed nothing more than a quick search in the Clerk's database to see if Mr. Dude encumbered the Property when title was in his name between June 4, 2003 and June 9, 2003. If the Plaintiff had performed such a cursory search,[24] it would have discovered the WAMU Deed of Trust bearing the street address of the Property and thus would have discovered the falsity of the Defendant's misrepresentation.

In its post-trial brief, the Plaintiff points to a much-cited passage from *Field* in which the Supreme Court states:

> Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage.

*Field*, 516 U.S. at 70 (quoting Restatement (Second) of Torts § 540 cmt. b., illus. 1 (1977)). However, the Plaintiff is not a mere buyer of land. The Plaintiff and its agent Stewart Colorado are institutions in the business of underwriting and issuing title insurance policies, performing title examinations, and handling real estate closings. Unlike the hypothetical buyer of land referred to in the Restatement, this Plaintiff was required to "walk across the street." The Plaintiff did not justifiably rely on the Defendant's representation in the Defendant Affidavit that no liens encumbered the Property other than the Furr and Cohen Deed of Trust and the Washington Mutual Deed of Trust.

---

[24] It is not clear whether Stewart Colorado, the Plaintiff's agent, actually searched under the correct spelling of Mr. Dude's name ("Harald"). Based on the evidence before the Court, it is not possible to conclusively find that the Plaintiff did or did not complete such a search. In any case, it should have done so.

In applying the standard of justifiable reliance, it is difficult for the Court to imagine a closer case. There is no doubt that the Defendant intended to and did in fact deceive the Plaintiff, achieving a sizeable monetary benefit for herself and causing significant harm to the Plaintiff. On the other hand, taking into account the nature of the Plaintiff as the law requires, the Plaintiff's failure to uncover the WAMU Deed of Trust is much more than mere negligence. The Plaintiff has the burden here, by a preponderance of the evidence, and that burden was not met.

As a result, the Claim of the Plaintiff is subject to discharge in this case.

**G.      Counterclaim**

The Defendant did not go forward with her Counterclaim at trial. Therefore, the Court will enter judgment in favor of the Plaintiff as to Counts I and II of the Counterclaim.

**III.      CONCLUSION**

For the foregoing reasons, the Court will enter a separate judgment:

1. In favor of the Plaintiff as to Count I of the Complaint, allowing the Claim as a general unsecured claim in the amount of $2,925,000.00;

2. In favor of the Defendant as to Count II of the Complaint;

3. In favor of the Plaintiff as to Count III of the Complaint, allowing the Claim as a general unsecured claim in the amount of $1,950,000.00, plus pre-judgment interest at eight (8%) percent per annum (compounded annually) from October 15, 2007 up to June 17, 2011, that is, $638,345.78, for a total of $ 2,588,345.78;[25]

4. In favor of the Defendant as to Count IV of the Complaint;

---

[25] Because this amount is less than the amount allowed under Count I of the Complaint, the Plaintiff's allowed unsecured claim in this case will be $2,925,000.00.

     5.  In favor of the Defendant as to Count V of the Complaint, such that the Claim will be subject to discharge in the Defendant's bankruptcy case;

     6.  In favor of the Plaintiff as to Count I of the Counterclaim; and

     7.  In favor of the Plaintiff as to Count II of the Counterclaim.

###

Copies to:

All attorneys of record by the Clerk of Court.